# In the United States Court of Federal Claims

No. 10-885C
(Filed: October 23, 2013)

_____

)
FREDERICKSBURG NON-PROFIT           )
HOUSING CORP.,                      )
                                    )      Lack of Subject Matter Jurisdiction
                    Plaintiff,      )      Under 28 U.S.C. § 2501; Statute of
                                    )      Limitations; Failure to State a Claim
v.                                  )      for Anticipatory Breach of Contract;
                                    )      Anticipatory Repudiation; Low-
THE UNITED STATES,                  )      Income housing; LIHPRHA; Plan of
                                    )      Action; Section 8 Subsidies.
                    Defendant.      )
                                    )
_____

*Edward M. Lavin*, San Antonio, TX, counsel for plaintiff.

*Antonia R. Soares*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Assistant Attorney General, and *Jeanne E. Davidson*, Director, Commercial Litigation Branch, for defendant.

## O P I N I O N

This case involves a 1995 agreement between the Department of Housing and Urban Development ("HUD") and Fredericksburg Non-Profit Housing Corp. ("plaintiff" or "Fredericksburg") to provide low-income housing at the Apartments Northwest apartment complex ("Apartments Northwest") in San Antonio, Texas. Fredericksburg claims that HUD breached the 1995 agreement when it failed to provide certain rent subsidies and rent increases for low-income housing allegedly promised to plaintiff in the 1995 agreement. Plaintiff seeks $6,270,030 in unpaid rent subsidies and unspecified

damages related to the maximum allowable rental rates.[1]  Plaintiff also seeks rescission on the grounds that HUD repudiated its obligation to either (1) provide Fredericksburg with sufficient assistance to ensure the financial viability of Apartments Northwest as low-income housing or (2) relax or remove the affordability requirements contained in the 1995 agreement.

The United States ("the government" or "defendant") has moved to dismiss the complaint pursuant to Rule of the Court of Federal Claims ("RCFC") 12(b)(1) for lack of jurisdiction and RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.  The government argues in its RCFC 12(b)(1) motion that plaintiff's claims for damages stemming from HUD's failure to provide Section 8 subsidies or rent increases under the 1995 agreement are barred by the six-year statute of limitations found at 28 U.S.C. § 2501 (2012).  The government argues in its RCFC 12(b)(6) motion that plaintiff cannot state a claim for anticipatory breach of contract because plaintiff has not properly alleged that HUD repudiated any of the duties contained in the 1995 agreement.  The parties have also cross-moved for summary judgment on the government's liability for breach.[2]

Because the court finds that plaintiff's claims for unpaid subsidies and rent increases are time-barred under 28 U.S.C. § 2501, the government's motion to dismiss

---

[1] Plaintiff has abandoned a claim for $1,871,145 in connection with HUD's alleged failure to provide annual owner distributions.  These distributions were not available to Fredericksburg because it is a non-profit.  Pl.'s Sur-Reply 1 n.1, ECF No. 26,  July 20, 2011.

[2] Plaintiff has also moved to strike the declaration of Deborah Talamantes that was attached to the government's November 13, 2012 renewed motion to dismiss and cross-motion for summary judgment.

those claims under RCFC 12(b)(1) is **GRANTED**.  Further, because plaintiff has not

shown that HUD has repudiated any alleged contractual obligations, plaintiff has failed to

state a claim for anticipatory breach of contract.  Therefore, the government's request to

dismiss plaintiff's claim for rescission is **GRANTED** pursuant to RCFC 12(b)(6).  As

there are no surviving claims for relief, the parties' cross-motions for partial summary

judgment are **DENIED-AS-MOOT**.

## I. BACKGROUND[3]

Fredericksburg is a Texas non-profit corporation which, since December 1995, has

owned the Apartments Northwest apartment complex located in San Antonio, Texas.

Fredericksburg purchased the complex from Bion Development Corporation ("Bion") in

1995 in connection with HUD's initiative to maintain affordable housing under the Low-

Income Housing Preservation and Resident Homeownership Act.  Pub. L. No. 101-625,

tit. VI, 104 Stat. 4249 (1990) (codified as amended in scattered sections of 12 U.S.C.)

("LIHPRHA").  A brief review of LIHPRHA is helpful in understanding the factual

context of this dispute.

### A.  Statutory and regulatory background

The relevant statutory history begins with the National Housing Act of 1934

("NHA"), Pub. L. No. 73-479, § 1, 48 Stat. 1246 (1934).  Congress enacted the NHA to

address the nation's declining stock of affordable housing.  See generally Cienega

---

[3] These facts are undisputed and are taken from the Amended Complaint, the parties' briefs, and the attachments thereto.  Facts outside of the pleadings are considered solely for the purpose of adjudicating the government's RCFC 12(b)(1) motion to dismiss for lack of jurisdiction.

<u>Gardens v. United States</u>, 503 F.3d 1266, 1270 (Fed. Cir. 2007).  The NHA established

the Federal Housing Administration ("FHA"), which was later subsumed into HUD.  <u>Id.</u>

at 1270 n.1.  Over the next fifty years, Congress amended the NHA to enable FHA and

HUD to provide low-interest or subsidized loans to property owners willing to maintain

their properties as affordable housing.  <u>Id.</u> at 1270-71.  In exchange, property owners and

HUD would enter into a regulatory agreement through which any important management

decisions, including increases in rents, generally had to be approved by HUD until the

mortgage was paid off.  <u>Id.</u>  The mortgage contracts were for forty years, but included an

option to eliminate HUD's management control by prepaying the mortgage after 20

years.  <u>Id.</u> at 1270.

      In the 1980s Congress became concerned that the availability of affordable

housing would once again decline as prepayment dates arrived and the restrictions

imposed during the mortgage period expired.  <u>Id.</u> at 1272.  To address this

> Congress reacted with a carrot-and-stick approach, first enacting [the
> Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA")]
> (a temporary measure), and then superseding this statute by LIHPRHA in
> 1990 (initially planned as a permanent measure).  In enacting these statutes,
> Congress sought to "balance the public policy need to preserve housing for
> low income families with the perceived contractual rights of the owners."

<u>Id.</u> (quoting H.R. Rep. No. 101-559, at 75 (1990)).  Under LIHPRHA, owners wishing to

prepay their mortgages and exit the low-income housing programs were barred from

doing so until after they offered their property for sale to owners who would preserve the

rent restrictions of the programs.  <u>Id.</u>  If a sale was approved by HUD, the purchaser was

provided with financial assistance.  <u>Id.</u>  Owners willing to stay in the program could also

elect to receive financial incentives by signing a "Use Agreement" with HUD.  Id. at

1273.  In exchange for these incentives, owners had to agree to maintain the remaining

restrictions "for the remaining useful life of such housing." [4]  Id. (citing 12 U.S.C. §

4112(a)(2)(A) (2000)).  It was under this program that Bion conveyed Apartments

Northwest to Fredericksburg.

LIHPRHA established a process to determine the financial incentives associated

with the property transfer.  For parties that intended to extend the affordability

restrictions through sale, LIHPRHA requires that owners submit to HUD a Plan of Action

("POA"), in which the current and prospective owner describe, among other things, (1)

any proposed changes in the status or terms of the prior regulatory or mortgage

agreement; and (2) "incentives requested . . . and analyses of how the owner would

address any physical or financial deficiencies and maintain the low-income affordability

restrictions of the housing."  12 U.S.C. § 4107.

Sections 4109(b) and 4110 of Title 12 define the financial incentives available to

induce an owner to extend low-income use of the property through sale. [5]  These

incentives include, among other things: (1) an increase in the rents on units occupied by

the current tenants as permitted under 12 U.S.C. § 4112; (2) financing of capital

improvements; (3) an increase in the rents permitted under an existing contract under 42

---

[4] "Remaining useful life" is "the period during which the physical characteristics of the housing remain in a condition suitable for occupancy, assuming normal maintenance and repairs are made and major systems and capital components are replaced as become necessary."  12 U.S.C. § 4112(c)(1).  Property owners can petition HUD for a determination that the useful life has expired fifty years after HUD approves the owner's Plan of Action.  See 12 U.S.C. § 4112(c)(3).

[5] Section 4110 supplements the incentives available under section 4109.

U.S.C § 1437f, which codifies the Section 8 Housing Program;[6] and (4) additional assistance under 42 U.S.C. § 1437f for an extension of any project-based assistance attached to the housing.  12 U.S.C. §§ 4109(b), 4110.  The latter two incentives are permitted subject to the availability of funds.  12 U.S.C. § 4109(b).

Although LIHPRHA was designed to bind subsequent owners to the affordability restrictions, owners are allowed to terminate the restrictions in certain circumstances.  In particular, the act permits voluntary termination, subject to 12 U.S.C. § 4113 (Assistance for displaced tenants), in the event that HUD approves a POA but fails "to provide the assistance approved in such plan during the 15-month period beginning on the date of [POA] approval."  12 U.S.C. § 4114(a)(1)(A).  Similarly, 12 U.S.C. § 4114(b) provides that, when providing Section 8 assistance under 42 U.S.C. § 1437f:

> [T]he Secretary may enter into a contract with an owner, contingent upon the future availability of appropriations for the purpose of renewing expiring contracts for rental assistance as provided in appropriations Acts, to extend the term of such rental assistance for such additional period or periods necessary to carry out an approved plan of action.  The contract and the approved plan of action shall provide that, if the Secretary is unable to extend the term of such rental assistance or is unable to develop a revised package of incentives providing benefits to the owner comparable to those received under the original approved plan of action, the Secretary, upon the request of the owner, shall (1) . . . modify the binding commitments . . . that are dependent on such rental assistance[, or] (2) permit the owner to prepay the mortgage and terminate the plan of action and any implementing use agreements or restrictions . . . .

12 U.S.C. § 4114(b).

---

[6] Under the Section 8 program, HUD provides assistance payments to private landlords who operate low-income housing projects.  These payments are meant to cover the difference between tenant rent payments and the contract rent agreed upon by HUD and the landlord.  See Normandy Apartments, Ltd. v. United States, 100 Fed. Cl. 247, 249 (2011).

**B. Prior ownership of Apartments Northwest**

Quincy Lee was the original developer and owner of the apartment complex.  In November 1968, Mr. Lee executed a secured note in favor of First Mortgage Company of Texas, Inc.  Mr. Lee also executed a deed of trust, as well as a regulatory agreement with HUD under section 221(d)(3) of the NHA.  Prior to June 9, 1981, J.C. Burch Apartments, Ltd. ("Burch") acquired the apartment complex from Mr. Lee.  Burch assumed and agreed to be bound by the note, deed of trust, and regulatory agreement.  On June 9, 1981, Bion acquired the apartment complex.  Bion assumed and agreed to be bound by the note, deed of trust, and regulatory agreement.

**C. Development and approval of the Plan of Action for Apartments Northwest**

Sometime after December 8, 1994, Fredericksburg and Bion submitted a POA to HUD that specified various incentives to be provided to enable Fredericksburg to continue operating the property as affordable housing after purchasing the property from Bion.  Among other things, the POA identified (1) a $77,964 grant to facilitate Fredericksburg's purchase of the property, (2) a $2,515,415 equity loan insured under Section 241(f) of the National Housing Act,[7] (3) the right to seek future rent increases, and (4) a five-year contract for $500,000 in annual Section 8 assistance for the building's

---

[7] This loan included a $1,481,325 Acquisition Loan, a $921,016 Rehabilitation Loan to undertake certain repairs and improvements, $146,653 for transaction costs, and $33,579 for loan costs.  <u>See</u> Pl.'s Mot. Partial Summ. J., Plan of Action, Ex. H, at II-3, ECF No. 54-8.

140 units.[8]  Section III of the POA stated that, apart from the $77,964 grant,

Fredericksburg had not applied for any additional grant funds in connection with the

purchase.

On June 29, 1995, the Chief of HUD's Asset Management Branch, San Antonio

Field Office, sent a letter to Bion and stated that HUD had approved certain incentives in

the POA.  Among other things, HUD approved 123 units for Section 8 subsidies, "which

must be provided to all current very low- and low-income tenants at the project."  See

Def.'s Renewed Mot. Dismiss, Ex. A-24, ECF No. 59-1.  In addition, the letter approved

certain rental rates according to unit type, and specified that 91 units would be used for

Very Low-Income tenants, 32 units would be used for Low-Income tenants, and 16 units

would be used for Moderate Income tenants.  The letter further stated that the owner

could apply for general project rent increases on an annual basis.

HUD's approval of the POA was conditioned, however, on "the availability of

sufficient Preservation/Homeownership Incentives (Section 8 contract budget authority,

Gap Grants, Five Percent Equity Grants and/or Homeownership Funds) at the time of the

endorsement."  Id.  In addition, HUD stated that it would "request funding from the

Preservation Division in HUD Headquarters to enable [the parties to the agreement] to

implement the POA."  Id.

---

[8] The POA noted that Apartments Northwest did not then have a Housing Assistance Payment ("HAP") contract for Section 8 Housing assistance.  See Pl.'s Mot. Partial Summ. J., Plan of Action, Ex. H, at I-3, II-1 to II-2, ECF No. 54-8 ("Since the current gross annual contract authority is non-existent it is not sufficient to fund the requested federal incentives without any current contract terms.  Therefore, current term contract authority must be implemented as illustrated . . . A total of 140 units will become eligible to receive assistance under the new contract(s) bringing the total number of assisted units to 140.").

**D.  The Capital Grant and Use Agreements between Fredericksburg and HUD**

On December 15, 1995, Bion conveyed the property to plaintiff.  On December 28, 1995, Fredericksburg and HUD signed, effective December 15, (1) a Capital Grant Agreement ("Grant Agreement") and (2) a Use Agreement And Amendment Of Existing Regulatory Agreement For Multifamily Projects Insured Or Assisted Under Section 221(D)(3) (Below Market Interest Rate) of The National Housing Act and Subject to the Low Income Housing Preservation and Resident Homeownership Act of 1990 With a Capital Grant and Sale of Property ("Use Agreement").

**1.  The Use Agreement**

The Use Agreement, which was signed by David Stone, Fredericksburg's then-Director/President, and Elva Castillo, the Director of HUD's San Antonio Field Office of Multifamily Housing, acknowledged that incentives would be provided by HUD and that the affordability requirements would apply for the useful life of the project.  The Use Agreement incorporated some and removed other provisions of the original Regulatory Agreement, and specified that Fredericksburg, "to the extent practicable, would maintain the 140 units in Apartments Northwest as affordable in the following proportions:  91 units for Very Low- Income Tenants, 32 units for Low-Income Tenants, and 17 units for Moderate Income Tenants."  See Pl.'s Mot. Partial Summ. J., Use Agreement, Ex. E, at 3, ECF No. 54-5.  The Use Agreement further specified that "[i]n renting vacant units to new tenants, the Owner may deviate from the . . . Tenant Profile to the extent necessary to keep the project financially viable, only with the approval of HUD."  Id.

9

## 2.  The Grant Agreement

The Grant Agreement was also signed by Fredericksburg's Director/President and

the Director of HUD's San Antonio Field Office of Multifamily Housing.  The Grant

Agreement provided:

> The Grantee agrees to carry out the Grant activities under this Agreement
> with LIHPRHA, the regulations at 24 C.F.R. Parts 84 and 248, the
> Preservation Capital Needs Assessment, the approved Plan of Action,
> which is attached as Exhibit 1, the Use Agreement, which is attached as
> Exhibit 2, and any other applicable laws, regulations and other
> requirements (including recordkeeping requirements).

See Notice, Grant Agreement, Ex. A, ECF No. 31, at 4, August 11, 2011.

HUD and Fredericksburg agreed that HUD would provide Fredericksburg with

$2,099,411 in the form of a grant,[9] which was to be allocated as follows:

(1)     Deposit to the Reserve for Replacement ($94,279);
(2)     Repairs or Substantial Rehabilitation Costs ($272,903);
(3)     Repairs or Substantial Rehab Contingency ($27,290);
(4)     Repairs or Sub\Rehab Transaction Costs ($44,176);
(5)     Transfer Preservation Equity ($1,658,034).

Id.  These funds were expressly contingent on (1) transfer and recording of the property

deed; (2) availability of grant funds; (3) execution of the Use Agreement; and (4)

execution of any other document that HUD deemed necessary.[10]  Id. at 5.

---

[9] Although the Grant Agreement recites $2,099,411 as the total grant amount, the sum of the
individual allocations is $2,096,682.  This discrepancy is not relevant to the parties' motions.

[10] The Grant Agreement specified that the funds "are to be used solely for those purposes
specified in the Sources and Uses of Funds Statement which is attached as Exhibit 3, and all
exhibits thereto, all of which are incorporated in and considered a part of this agreement."
Notice, Grant Agreement, Ex. A, ECF No. 31, at 4.

**E.  Fredericksburg's requests for rental rate increases and Section 8 subsidies**

Beginning in 1996, Fredericksburg periodically sought rental rate increases from

HUD, all but one of which were approved.  On June 18, 1996, Fredericksburg's

management company sent a letter to HUD requesting a budget-based rent increase,

which was denied on August 7, 1996.  See Def.'s Renewed Mot. Dismiss, Ex. A-7, A-9,

ECF No. 59-1.  Subsequent rent increases were approved, however, in February 2002,

July 2008, and April 2011.[11]  See Def.'s Reply, Exs. D, F, H, ECF No. 17, May 20, 2011.

Although plaintiff never received any Section 8 subsidies during the five-year period

beginning in 1995, there is no evidence that Fredericksburg ever sought to rescind the

Use Agreement by invoking the voluntary termination procedures found in 12 U.S.C. §

4113.

**F.  Fredericksburg's attempt to terminate the Use Agreement**

On February 4, 2010, Sherry Deeken, Fredericksburg's President, faxed a letter

("February letter") to HUD in which Fredericksburg offered to pay $250,000 to HUD in

exchange for the mutual rescission of the Use Agreement.  Ms. Deeken claimed that

Fredericksburg had always managed the property in accordance with the Below Market

Interest Rate ("BMIR") program, rather than under the more onerous affordability

restrictions contained in the Use Agreement.  She further claimed that HUD had

inspected and approved Fredericksburg's management of the property under the BMIR

regulations for years, and that Fredericksburg had not been aware of the Use Agreement

---

[11] Plaintiff did not present any evidence or argument suggesting that Fredericksburg had ever
requested and been denied a rental rate increase since 1996.

until after Fredericksburg paid off the mortgage in 2008.  Ms. Deeken stated that

Fredericksburg had only received $250,000 worth of benefits under the Grant Agreement

and had not received any federal rent subsidies.  She also opined that enforcement of the

Use Agreement would lead to several residents being forced to move out of the apartment

complex.

Priscilla Rocha, the Supervisory Project Manager in the San Antonio Field Office

of HUD's Multifamily Program Center, rejected Ms. Deeken's offer in a letter dated July

22, 2010 ("July letter").  See Def.'s Renewed Mot. Dismiss, Ex. A-22, ECF No. 59-1.  In

that letter, Ms. Rocha stated that the $2,099,411 Capital Grant was used to fund equity,

closing and transaction costs, and rehabilitation of the property.  Id.  She stated that "[t]he

Department may not waive or terminate the Use Agreement as this is a statutory

requirement.  Statutory requirements can not [sic] be waived.  The Department has

reviewed your request and has determined that the Use Agreement is valid and binding

and can not [sic] be rescinded or terminated."  Id.  The letter further stated that

Fredericksburg was required to operate the project "in accordance with HUD Handbook

4350.5, Processing Plans of Action under Low Income Housing Preservation Act of 1990

Title VI and Title II and the approved Plan of Action dated October 10, 2010."  Id.  The

letter concluded by providing contact information for a HUD representative to answer

further questions from Ms. Deeken.  Id.

### G.  The instant litigation

On October 18, 2010, plaintiff filed suit in Texas state court.  See Petition,

Fredericksburg Non-Profit Housing Corp. v. Donovan, No. 2010-CI-17230 (Bexar Cnty.

Dist. Ct. filed October 14, 2010).  The action was removed to the United States District Court for the Western District of Texas on November 19, 2010, and subsequently transferred to this court on December 21, 2010.  See Case Transfer, ECF No. 1.  Plaintiff filed an amended complaint on January 19, 2011.

In its amended complaint, plaintiff makes several allegations consistent with those contained in Fredericksburg's February letter to HUD.  Plaintiff alleges that

> at no time was the property ever operated in accordance with the . . . Use Agreement, but rather was and continues to be operated as a HUD BIMR Property.  HUD was at all times and is aware of this fact and HUD representatives have over the years treated the property as a BIMR property and subject to those regulations.

Am. Compl. ¶ 7.[12]  Plaintiff further asserts that under the POA, "substantial monetary concessions . . . should have been provided by HUD to [Fredericskburg], but were not."  Id. ¶ 12.  The amended complaint also describes Fredericksburg's unsuccessful attempt, in 2010, to convince HUD to rescind the Use Agreement.[13]  See Id. ¶¶ 11, 15.  Although plaintiff alleges that being forced to comply with the Use Agreement would cause

---

[12] Similarly, plaintiff alleges that "[n]either the owner nor HUD has paid any attention to the LIPHRA [sic] program or the Use Agreement, nor the unimplemented Plan of Action.  Both parties have throughout this time assumed the property was regulated under the [BMIR] program, and . . . the property passed all required HUD inspections."  Am. Compl. ¶13.

[13] Paragraph 15 of the complaint states:

> Since early 2010 Plaintiff has attempted to convince HUD of the obvious mutual mistakes and breaches . . . and of the resulting need for HUD to cancel the LIPHRA [sic] Use Agreement.  However, on July 22, 2010 in writing HUD refused to do so and demanded that Plaintiff . . . continue to comply with a canceled and obsolete federal program while continuing to refuse to perform its own obligations under the parties' agreement.

Am. Compl. ¶15.

Fredericksburg "to rent apartments for well below the market rate, with no subsidy," the amended complaint does not address the Apartment Complex's present financial viability. Id. ¶ 20.

On August 12, 2011, the court stayed consideration of the government's motion to dismiss to allow for jurisdictional discovery. Following discovery, the government renewed its motion to dismiss and moved, in the alternative, for summary judgment. Plaintiff filed a response and moved for partial summary judgment on liability for breach of contract. Plaintiff also moved to strike portions of the declaration of a HUD Employee, Deborah Talamantes, which was attached to the government's renewed motions. Briefing was completed on April 22, 2013, and argument was held on June 21, 2013. The court ordered supplemental briefing as to whether plaintiff had stated a valid claim as to anticipatory breach of contract, which was completed on August 30, 2013. The government has moved to dismiss the anticipatory breach claim pursuant to RCFC 12(b)(6).

## II. DISCUSSION

### B. The government's RCFC 12(b)(1) motion to dismiss for lack of jurisdiction

#### 1. Standard of review for RCFC 12(b)(1) motions to dismiss

The Tucker Act establishes this court's jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

28 U.S.C. § 1491(a)(1).  However, claims under the Tucker Act are subject to the six-year statute of limitations set forth in 28 U.S.C. § 2501.  In the absence of a statutory waiver, this six-year limitations period is jurisdictional and is not susceptible to equitable tolling.  See John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 136 (2008).  A claim under the Tucker Act accrues as soon as all events have occurred that are necessary to enable plaintiff to bring suit.  See Goodrich v. United States, 434 F.3d 1329, 1333 (Fed. Cir. 2006).

Under the "continuing claims" doctrine, there are circumstances when later arising claims may be heard "even if the statute of limitations has lapsed for earlier events." Tamerlane, Ltd. v. United States, 550 F.3d 1135, 1145 (Fed. Cir. 2008); Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 879 (Fed. Cir. 1998).  However, "[i]n order for the continuing claims doctrine to apply, plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages."  Brown Park Estates v. United States, 127 F.3d 1449, 1456 (Fed. Cir. 1997); Ariadne, 133 F.3d at 879 ("The continuing claims doctrine often operates to save parties who have pled a series of distinct events—each of which gives rise to a separate cause of action—as a single continuing event.").  "The continuing claims doctrine does not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time."  Ariadne, 133 F.3d at 879.

Where, as here, the government has moved to dismiss on jurisdictional grounds, including that the case is barred by the statute of limitations, "the factual allegations in the complaint are not controlling and only uncontroverted factual allegations are accepted

as true." <u>Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States</u>, 672 F.3d 1021, 1030 (Fed. Cir. 2012). The court may look beyond the pleadings and inquire into jurisdictional facts to determine whether jurisdiction exists. <u>See</u> <u>Rocovich v. United States</u>, 933 F.2d 991, 993 (Fed. Cir. 1991). Ultimately, plaintiff bears the burden of establishing, by a preponderance of the evidence, facts sufficient to invoke the court's jurisdiction. <u>See</u> <u>Reynolds v. Army & Air Force Exch. Serv.</u>, 846 F.2d 746, 748 (Fed. Cir. 1988).

> **2. Fredericksburg's claims for breach of contract damages and rescission stemming from HUD's alleged failures to provide Section 8 subsidies and rent increases are time-barred**

The government argues that any claim that plaintiff might have had for damages related to HUD's failure to provide Section 8 rent subsidies accrued in December 1995, once Fredericksburg became a party to the Use Agreement and knew or should have known that it would not be given the allegedly-promised Section 8 subsidies. The government also argues that plaintiff's claims for unpaid subsidies would not be salvaged by the continuing claims doctrine because (1) Fredericksburg did not possess a statutory or contractual right to periodic payments from the government beyond 5 years, (2) all of the events necessary to fix liability occurred outside the statute of limitations, and (3) plaintiff's claims stem from a single distinct event: the failure to provide Fredericksburg with a contract for subsidies for the limited period promised. The government therefore contends that plaintiff's claims are time-barred under 28 U.S.C. § 2501 and must be dismissed.

In response, plaintiff argues that the language of the POA and the Use and Grant Agreements contractually obligate the government to provide Fredericksburg with Section 8 subsidies for the duration of the apartment complex's useful life. As such, plaintiff contends that each month that the government failed to provide Section 8 subsidies to Fredericksburg breached the agreement, and thus plaintiff has alleged a continuing claim.

The court agrees with the government and finds that any of plaintiff's claims for damages based on HUD's alleged failure to provide plaintiff with Section 8 subsidies are barred by the statute of limitations. To begin, regardless of whether the government breached the agreement by failing to provide Section 8 subsidies, the POA makes clear that any Section 8 subsidy contract was limited to $500,000 per year for only five years.[14] Thus, even assuming that the POA obligated the government to provide Section 8 subsidies for five years, which the government disputes, the alleged breach would have accrued, at the latest, in December 2000—at the end of the 5-year period beginning in December 1995. Plaintiff has not identified any language in the Use Agreement, Grant Agreement, or the POA to suggest that HUD had agreed to provide Fredericksburg with Section 8 subsidies beyond 5 years. Thus, the statute of limitations on the last of Fredericksburg's Section 8-based claims would have run on December 15, 2006.

---

[14] The POA states that "current term contract authority must be implemented as illustrated below," and then lists the following:

| # of Units | Contract # | Term | Annual Authority |
|------------|------------|------|------------------|
| 140 Units | TX??-M000-??? | 5 years | $500,000.00 |

Because plaintiff filed its complaint, at the earliest,[15] on October 18, 2010, Fredericksburg's claim for damages related to receipt of Section 8 subsidies is time-barred under 28 U.S.C. § 2501. For this reason, the government's motion to dismiss those claims under RCFC 12(b)(1) is **GRANTED**.

In addition, the court finds that plaintiff's claim for breach based on HUD's failure to approve rent requests is similarly time-barred. The only request for a rental rate increase that HUD rejected occurred in 1996. That claim accrued more than six years ago, and is therefore time-barred under 28 U.S.C. § 2501. As a result, the government's motion to dismiss that claim under RCFC 12(b)(1) also must be **GRANTED**.

### C. The government's RCFC 12(b)(6) motion to dismiss for failure to state a claim

#### 1. Standard of review for RCFC 12(b)(6) motions to dismiss

In addition to its claims for damages based on HUD's refusal to provide plaintiff with Section 8 subsidies and rent increases in the past, plaintiff also argues that HUD should be deemed in breach of its agreement with plaintiff because HUD's July letter

---

[15] Section 1631 of Title 28 operates to preserve the time of filing in a transferred case before this court. The Federal Circuit has not squarely addressed whether, for the purposes of 28 U.S.C. § 2501, the date of filing should relate back to the date when the plaintiff originally filed in state court or the date when the action was removed to federal court. See 28 U.S.C. § 1631. Fredericksburg argues that the six-year time period should measure backwards from its October 18, 2010 filing in state court. In at least one opinion, this court has held that the date of filing relates back to the date when the action was filed in state court. See Arakaki v. United States, 62 Fed. Cl. 244, 248-54 (2004) (relation back to state court filing date appropriate where "the transferor district court has analyzed the issue and found the state court filing date to be the proper filing date in federal court for statute of limitations purposes"). Because the court concludes that Fredericksburg's claims would be time-barred regardless of whether the date of filing relates back to state court proceeding or the removal date, the court does not reach this question.

constituted a refusal to either (1) provide Fredericksburg with sufficient assistance to

ensure the financial viability of Apartments Northwest as low-income housing or (2)

relax or remove the affordability requirements contained in the 1995 agreement.[16]  Under

the well-settled standard of review for motions under RCFC 12(b)(6), Fredericksburg

"must allege facts plausibly suggesting (not merely consistent with) a showing of

entitlement to relief."  Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir.

2012) (quotations omitted).  The court may deny the government's motion even where

plaintiff's factual allegations are doubtful in fact, provided that they move beyond the

speculative level.  Id. at 1367-68 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557

(2007)).  The court is not, however, required to accept a plaintiff's legal conclusions,

even when couched as factual allegations.  Twombly, 550 U.S. at 564.

### 2.  Fredericksburg has failed to state a claim for anticipatory breach of contract

A party anticipatorily repudiates a contract by renouncing a contractual duty

before the designated time for performance.  See Indiana Michigan Power Co. v. United

States, 422 F.3d 1369, 1374 (Fed. Cir. 2005) (quoting Franconia Assocs. v. United States,

536 U.S. 129, 143 (2002)).  Repudiation can be effected either by a voluntary affirmative

act indicating that the promisor will breach, Franconia Assocs., 536 U.S. at 143 (citing

---

[16] The court allowed for briefing on plaintiff's anticipatory breach claim following argument, once it was made clear that plaintiff believed HUD's response to its 2010 request for rescission amounted to a breach of contract.  The scope of the court's June 26, 2013 Order calling for supplemental briefing was plainly limited to the question of whether the plaintiff had stated a valid claim for anticipatory breach of contract.  The court will disregard those arguments in the plaintiff's supplemental brief that fall outside the scope of the order, including whether the POA was incorporated into the Grant and/or Use Agreements.

Restatement (Second) of Contracts § 252 (1981)), or by "a 'statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach,'" Amber Res. Co. v. United States, 538 F.3d 1358, 1368 (Fed. Cir. 2008) (quoting Restatement (Second) of Contracts § 250). Repudiation discharges the other party's remaining duty to render performance. See Restatement (Second) of Contracts § 253. To state a claim for anticipatory breach, however, the aggrieved party must treat the repudiation as a total breach, terminate the contract, and file suit. See Haddon Hous. Associates, Ltd. P'ship v. United States, 711 F.3d 1330, 1339 (Fed. Cir. 2013) (citing 13 Williston on Contracts § 39:32 (4th ed.)).

The Federal Circuit has recognized at least two scenarios by which a party will be treated as having repudiated a contract. First, repudiation may occur where a party "clearly and expressly" communicates its intention not to perform. Dow Chem. Co. v. United States, 226 F.3d 1334, 1345 (Fed. Cir. 2000) (holding agency's letter to plaintiff repudiated licensing agreement by stating agency would refuse to make payments and that requests for reconsideration would be denied). In addition, where an obligee reasonably believes that the obligor will breach by non-performance, the obligor's failure to provide adequate assurances may be treated as repudiation. See Danzig v. AEC Corp., 224 F.3d 1333, 1337 (Fed. Cir. 2000) (government agency entitled to terminate a contract for default because plaintiff had failed to provide adequate assurances that it could timely perform).[17] The reasonableness of the obligee's belief that the obligor will not perform is

---

[17] In Danzig, the Federal Circuit cited Restatement (Second) of Contracts § 251, which states:

to be determined in light of all the circumstances.  <u>See</u> Restatement (Second) of Contracts § 251.

Fredericksburg argues that under the Use Agreement, HUD is contractually obligated to either (1) provide financial assistance—sufficient to ensure the financial viability of Apartments Northwest as low-income housing or (2) relax or remove the affordability requirements of the Use Agreement.  Plaintiff asserts that without significant financial assistance, Fredericksburg cannot meet the low-income unit requirements set in the POA.  Plaintiff therefore concludes that HUD's July 2010 letter, which stated that Fredericksburg would remain obligated to provide affordable housing, constituted an anticipatory repudiation of HUD's contractual obligations.

The government argues in its 12(b)(6) motion that plaintiff has failed to allege sufficient facts to support an anticipatory breach claim.  Specifically, the government argues that HUD's July letter could not constitute a repudiation of HUD's obligations because the letter (1) never specifically references any alleged contractual obligation to assure Apartments Northwest's financial viability or remove the Use Agreement's

---

(1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach . . . the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.

(2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

<u>Danzig</u>, 224 F.3d at 1337.

affordability requirements; (2) never distinctly and unequivocally indicates HUD's refusal to perform any alleged contractual obligation; and (3) represents only a rejection of Fredericksburg's offer, rather than an affirmative act indicating an unwillingness to perform.  Moreover, according to the government, the letter does not provide the "reasonable grounds" necessary to support Fredericksburg's belief that HUD intended to breach the agreement.[18]

The court concludes that even taking plaintiff's allegations as true, Fredericksburg has not stated a claim for anticipatory breach.  Plaintiff's repudiation theory is premised on the legal effect of HUD's July letter, which responded to Fredericksburg's February 2010 letter asking HUD to rescind the Use Agreement in exchange for $250,000.[19]  Yet

---

[18] According to the government, plaintiff must petition HUD for an administrative remedy—namely, a determination as to whether deviation from the tenant profile is appropriate.  The government asserts that Fredericksburg has not sought such a remedy.  The government further contends that even if HUD had issued a final decision, a United States district court—rather than the Court of Federal Claims—would possess exclusive jurisdiction pursuant to the Administrative Procedures Act.

[19] For the purpose of ruling on the government's RCFC 12(b)(6) motion, the court will consider the Use Agreement, POA, Fredericksburg's February letter, and HUD's July Letter.  All other exhibits and evidence submitted by the parties has not been considered by the court in ruling on the government's RCFC 12(b)(6) motion.

The Use Agreement, POA, and HUD's July letter are each integral to plaintiff's claims and expressly referenced by the amended complaint.  The plaintiff's February letter is integral to plaintiff's claim and indirectly referenced by the complaint.  The authenticity of these documents, which have been provided by the parties, has not been questioned.  The ability of the court to consider documents integral to the claim under Rule 12(b)(6) has been recognized by several circuits (although it has not been addressed by the Federal Circuit), and the court does so here without converting the motion to one for summary judgment.  See Normandy Apartments, 100 Fed. Cl. at 255 n.10 (citing cases); 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2013) (when considering a motion to dismiss under Rule 12(b)(6), trial courts may consider matters outside the complaint that are "incorporated by reference or integral to the claim . . . and exhibits attached to the complaint whose authenticity is unquestioned . . . without converting the motion into one for summary judgment").

HUD's July letter plainly constituted a rejection of this offer, rather than a repudiation of HUD's alleged contractual obligations.  This conclusion is due to the fact that neither the plaintiff's February letter nor HUD's July letter address whether Apartments Northwest had become financially non-viable, which would be the basis for obligating HUD to either provide additional financial assistance or relax the Use Agreement's affordability requirements.[20]  Moreover, neither letter refer to any of HUD's alleged contractual duties to either (1) provide financial assistance, (2) relax or remove the affordability requirements of the Use Agreement, or (3) consider plaintiff's future requests to relax or waive the affordability requirements.  As such, plaintiff has not raised a non-speculative allegation that HUD's July letter communicated a refusal to perform any of HUD's alleged contractual duties, or that HUD would refuse to grant relief to plaintiff in the event that Fredericksburg demonstrated that compliance with the Use Agreement's tenant profile would destroy Apartments Northwest's financial viability.[21]  See Danzig v. AEC Corp., 224 F.3d at 1337; Dow Chem. Co., 226 F.3d at 1345.

Plaintiff's contention that, in the future,  the government will hold it to certain low-income rental profiles in the face of evidence of financial non-viability is pure

---

[20] Although Fredericksburg's February letter describes the Use Agreement's affordability restrictions as "patently unconscionable and unfair," the letter never asserts that the Apartments Northwest had become financially non-viable.

[21] Even if this court concluded that plaintiff had reasonable grounds to believe that HUD would not satisfy its contractual obligations, plaintiff's reliance on Danzig is misplaced.  In Danzig, the court held that the government was entitled to terminate a contract for default after the government sought—and did not receive—assurances from the plaintiff.  Danzig, 224 F.3d at 1337.  Unlike the defendant in Danzig, Fredericksburg never sought assurances from HUD.  Therefore, the court rejects plaintiff's argument that Fredericksburg's duty to comply with the Use Agreement's tenant profile should be discharged.

speculation.[22]  Until such time as plaintiff asks HUD for relief from Apartments

Northwest's income profiles, there is no basis to assume that the request will be denied.

In sum, plaintiff's allegations concerning anticipatory repudiation do not go beyond

speculative level.  As a result, the government's motion to dismiss those allegations

under RCFC 12(b)(6) is **GRANTED**.

## III. CONCLUSION

Because plaintiff's claims for unpaid subsidies or rent increases are time-barred,

the government's RCFC 12(b)(1) motion to dismiss those claims for lack of jurisdiction

is **GRANTED**.  Further, because plaintiff has failed to allege that the government would

not or could not perform under the Use Agreement, the government's RCFC 12(b)(6)

motion to dismiss for failure to state a claim is **GRANTED**.  In the absence of any

remaining claims, the parties' cross-motions for summary judgment as to breach are

---

[22] The court notes that although plaintiff describes Fredericksburg's current financial state as "precarious" and "teetering on no longer being economically viable," Pl.'s Resp. Mot. Dismiss 7, August 29, 2013, plaintiff has not alleged a present inability to maintain and repair the property or an immediate need to evict higher income tenants.  Tellingly, plaintiff argues that HUD has tacitly agreed to allow Fredericksburg to deviate from the tenant profile listed in the Use Agreement.  See Pl.'s Resp. & Reply 16, ECF No. 64, January 21, 2013 ("after 18 years of HUD inspecting, and passing, the property based solely on BMIR criteria; and after 18 years of HUD making no mention of the property failing to comply with LIPHRA [sic] requirements; now all of a sudden the property 'may be in violation of the LIPHRA [sic] Use Agreement.'").  Thus, even assuming that HUD was required to ensure the continued financial viability of Apartments Northwest, Fredericksburg has failed to identify any action or inaction on the part of the government that has actually rendered the apartment complex financially non-viable.

**DENIED-AS-MOOT**.[23]  The Clerk is directed to enter judgment accordingly. Each party

shall bear its own costs.

     **IT IS SO ORDERED.**

                  s/Nancy B. Firestone
                  NANCY B. FIRESTONE
                  Judge

---

[23] For the same reason, the plaintiff's motion to strike the declaration of Deborah Talamantes is **DENIED-AS-MOOT**.  As discussed above, supra note 19, Ms. Talamantes' declaration was not considered by the court.